**Sealed**

Public and unofficial staff access
to this instrument are
prohibited by court order.

## UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| v. | § | Case No. H- 24-cr-89 |
| | § | |
| FLORENCIO "LENCHO" RENDON | § | |
| | § | |
| Defendant. | § | |

## PLEA AGREEMENT

The United States of America, by and through the undersigned attorneys for the United States Department of Justice, Criminal Division, Public Integrity Section; the undersigned attorneys for the United States Department of Justice, National Security Division, Counterintelligence and Export Control Section; and the Defendant, Florencio "Lencho" Rendon ("Defendant"), and Defendant's counsel, Craig Tobin, pursuant to Rule 11(c)(1)(A) and 11(c)(1)(B) of the Federal Rules of Criminal Procedure, state that they have entered into an agreement, the terms and conditions of which are as follows:

### Defendant's Agreements

1.     Defendant agrees to plead guilty to the Information.  The Information charges Defendant with conspiracy to commit money laundering, in violation of Title 18, United States Code, Section 1956(h).  Defendant, by entering this plea, agrees that he is waiving any right to have the facts that the law makes essential to the punishment proven to a jury or a judge beyond a reasonable doubt.  Defendant also waives any challenge to venue in this district.

### Punishment Range

2.     The statutory maximum penalty for a violation of Title 18, United States Code, Section 1956(h) is a term of imprisonment of not more than twenty years and a fine of not more

1

than $500,000 or twice the value of the property involved in the transaction, whichever is greater. *See* 18 U.S.C. §§ 1956(a), 1956(h). Additionally, Defendant may receive a term of supervised release after imprisonment of up to three years. *See* 18 U.S.C. §§ 3559(a)(3), 3583(b)(2). Defendant acknowledges and understands that if he should violate the conditions of any period of supervised release which may be imposed as part of his sentence, then Defendant may be imprisoned for no more than two years, without credit for time previously served on post-release supervision. *See* 18 U.S.C. §§ 3559(a)(3), 3583(e)(3). Defendant understands that he cannot have the imposition or execution of the sentence suspended, nor is he eligible for parole.

### Mandatory Special Assessment

3.      Pursuant to Title 18, United States Code, Section 3013(a)(2)(A), immediately after sentencing, Defendant will pay to the Clerk of the United States District Court a special assessment in the amount of one hundred dollars ($100.00) per count of conviction. The payment will be by cashier's check or money order payable to the Clerk of the United States District Court, c/o District Clerk's Office, P.O. Box 61010, Houston, Texas 77208, Attention: Finance.

### Immigration Consequences

4.      Defendant recognizes that pleading guilty may have consequences with respect to his immigration status. Defendant understands that if he is not a citizen of the United States, by pleading guilty he may be removed from the United States, denied citizenship, and denied admission to the United States in the future. Defendant understands that if he is a naturalized United States citizen, pleading guilty may result in immigration consequences, such as denaturalization and potential deportation or removal from the United States. Defendant's attorney has advised Defendant of the potential immigration consequences resulting from Defendant's plea of guilty, and Defendant affirms that he wants to plead guilty regardless of any immigration

consequences that may result from the guilty plea and conviction.

**Cooperation**

5.      The parties understand this Plea Agreement carries the potential for a motion for departure under Section 5K1.1 of the United States Sentencing Guidelines. Defendant understands and agrees that whether such a motion is filed will be determined solely by the United States. Should Defendant's cooperation, in the sole judgment and discretion of the United States, amount to "substantial assistance," the United States reserves the sole right to file a motion for departure pursuant to Section 5K1.1 of the Sentencing Guidelines. Defendant further agrees to persist in that plea through sentencing, and fully cooperate with the United States. Defendant understands and agrees that the United States will request that sentencing be deferred until that cooperation is complete.

6.      Defendant understands and agrees that the term "fully cooperate," as used herein, includes providing all information relating to any criminal activity known to Defendant—including, but not limited to, conspiring to launder proceeds of a criminal activity, namely bribery. Defendant understands that such information includes both state and federal offenses arising therefrom. In that regard:

(a)      Defendant agrees that this Plea Agreement binds only the United States Department of Justice, Criminal Division, Public Integrity Section; United States Department of Justice, National Security Division, Counterintelligence and Export Control Section; and Defendant, and that it does not bind any other United States Attorney or other component or unit of the Department of Justice;

(b)      Defendant agrees to testify truthfully as a witness before a grand jury or in any other judicial or administrative proceeding when called upon to do so by the United States. Defendant further agrees to waive his Fifth Amendment privilege against self-incrimination for the purpose of this Agreement;

(c)    Defendant agrees to voluntarily attend any interviews and conferences as the United States may request;

(d)    Defendant agrees to provide truthful, complete, and accurate information and testimony and understands any false statements made by Defendant to the grand jury or at any court proceeding (criminal or civil), or to a government agent or attorney, can and will be prosecuted under the appropriate perjury, false statement, or obstruction statutes;

(e)    At the Government's specific request, Defendant agrees to provide to the United States all documents in his possession or under his control relating to all areas of inquiry and investigation; and

(f)    Should the recommended departure, *if any*, not meet Defendant's expectations, Defendant understands that he remains bound by the terms of this Plea Agreement and that he cannot, for that reason alone, withdraw his plea.

**Waiver of Appeal and Collateral Review**

7.    Defendant is aware that Title 28, United States Code, Section 1291, and Title 18, United States Code, Section 3742, afford a defendant the right to appeal the conviction and sentence imposed. Defendant is also aware that Title 28, United States Code, Section 2255, affords the right to contest or "collaterally attack" a conviction or sentence after the judgment of conviction and sentence has become final. Defendant knowingly and voluntarily waives the right to appeal or "collaterally attack" the conviction and sentence, except that Defendant does not waive the right to raise a claim of ineffective assistance of counsel on direct appeal, if otherwise permitted, or on collateral review in a motion under Title 28, United States Code, Section 2255. In the event Defendant files a notice of appeal following the imposition of the sentence or later collaterally attacks his conviction or sentence, the United States will assert its rights under this Plea Agreement and seek specific performance of these waivers.

8.    Defendant also agrees that should the conviction following Defendant's plea of guilty pursuant to this Agreement be vacated for any reason, then any prosecution that is not time-

4

barred by the applicable statute of limitations on the date of the signing of this agreement (including any counts that the United States has agreed to dismiss at sentencing pursuant to this Agreement) may be commenced or reinstated against Defendant, notwithstanding the expiration of the statute of limitations between the signing of this Agreement and the commencement or reinstatement of such prosecution. It is the intent of this Agreement to waive all defenses based on the statute of limitations with respect to any prosecution that is not time-barred on the date that this Agreement is signed.

9. In agreeing to these waivers, Defendant is aware that a sentence has not yet been determined by the Court. Defendant is also aware that any estimate of the possible sentencing range under the sentencing guidelines that he may have received from his counsel, the United States, or the Probation Office, is a prediction and not a promise; did not induce his guilty plea; and is not binding on the United States, the Probation Office, or the Court. The United States does not make any promise or representation concerning what sentence Defendant will receive. Defendant further understands and agrees that the United States Sentencing Guidelines are not binding on the Court. *See United States v. Booker*, 543 U.S. 220, 245 (2005). Accordingly, Defendant understands that, although the Court must consult the Sentencing Guidelines and must take them into account when sentencing Defendant, the Court is not bound to follow the Sentencing Guidelines nor sentence Defendant within the calculated Guidelines range.

10. Defendant understands and agrees that each and all waivers contained in this Plea Agreement are made in exchange for the concessions made by the United States in this Plea Agreement.

### The United States' Agreements

11. If Defendant pleads guilty to the Information and persists in that plea through

sentencing, and if the Court accepts this Plea Agreement, the United States will not further prosecute the defendant for any crimes described in the attached factual basis or for any conduct of the defendant now known to the United States Department of Justice, Criminal Division, Public Integrity Section; and the United States Department of Justice, National Security Division, Counterintelligence and Export Control Section. This agreement does not provide any limitation of liability arising out of any acts of violence.

### Agreement Binding on Parties to Agreement Only

12.    The United States Department of Justice, Criminal Division, Public Integrity Section; and the United States Department of Justice, National Security Division, Counterintelligence and Export Control Section; agree that they will not further criminally prosecute Defendant for the specific conduct described in the Information.  This plea agreement binds only the United States Department of Justice, Criminal Division, Public Integrity Section; the United States Department of Justice, National Security Division, Counterintelligence and Export Control Section; and Defendant.  It does not bind any other United States Attorney or any other component of the Department of Justice.  The Department of Justice, Criminal Division, Public Integrity Section; and the United States Department of Justice, National Security Division, Counterintelligence and Export Control Section; will bring this Plea Agreement and the full extent of Defendant's cooperation to the attention of other prosecuting offices, if requested.

### United States' Non-Waiver of Appeal

13.    The United States reserves the right to carry out its responsibilities under the Sentencing Guidelines.  Specifically, the United States reserves the right to:

(a)    Bring its version of the facts of this case, including any evidence in the files of any investigative agency, to the attention of the Probation Office in connection with that office's preparation of a presentence report;

6

(b)     Set forth or dispute sentencing factors or facts material to sentencing;

(c)     Seek resolution of such factors or facts in conference with Defendant's counsel and the Probation Office;

(d)     File a pleading relating to these issues, in accordance with Section 6A1.2 of the Sentencing Guidelines and Title 18, United States Code, Section 3553(a); and

(e)     Appeal the sentence imposed or the manner in which it was determined.

### Sentence Determination

14.     Defendant is aware that the sentence will be imposed after consideration of the Sentencing Guidelines and Policy Statements, which are only advisory, as well as the provisions of Title 18, United States Code, Section 3553(a). Defendant nonetheless acknowledges and agrees that the Court has authority to impose any sentence up to and including the statutory maximum set for the offense to which Defendant pleads guilty, and that the sentence to be imposed is within the sole discretion of the sentencing judge after the Court has consulted the applicable Sentencing Guidelines. Defendant understands and agrees that the parties' positions regarding the application of the Sentencing Guidelines do not bind the Court and that the sentence imposed is within the discretion of the sentencing judge. If the Court should impose any sentence up to the maximum established by statute, Defendant cannot, for that reason alone, withdraw a guilty plea, and will remain bound to fulfill all of the obligations under this Plea Agreement.

15.     The United States and Defendant agree to the following regarding the Sentencing Guidelines applicable to Defendant's Guidelines range:

(a)     The Sentencing Guidelines do not bind the Court and are advisory in nature. The Court may impose a sentence that is either above or below Defendant's applicable Guidelines range, provided the sentence imposed is not "unreasonable."

(b)     Defendant consents to judicial fact-finding by a preponderance of the evidence for all issues pertaining to the determination of Defendant's

sentence, including the determination of any mandatory minimum sentence (including the facts that support any specific offense characteristic or other enhancement or adjustment), and any legally authorized increase above the normal statutory maximum.   Defendant waives any right to a jury determination beyond a reasonable doubt of all facts used to determine and enhance the sentence imposed, and waives any right to have those facts alleged in the information.  Defendant also agrees that the Court, in finding the facts relevant to the imposition of sentence, may consider any reliable information, including hearsay.

(c)    Defendant understands and agrees that the factual admissions contained in paragraphs 18-59 of this Plea Agreement, and any admissions that he will make during his plea colloquy, will be used to calculate Defendant's Guidelines range.

(d)    If the Court determines that Defendant qualifies for an adjustment under U.S.S.G. § 3E1.1(a), and the offense level prior to operation of § 3E1.1(a) is 16 or greater, the United States will move under § 3E1.1(b) for an additional one-level reduction because Defendant timely notified authorities of his intent to plead guilty, thereby permitting the United States to avoid preparing for trial and permitting the United States and the Court to allocate their resources more efficiently.

(e)    The parties understand, acknowledge and agree that there are no agreements between the parties with respect to any Sentencing Guidelines issues other than those specifically listed in paragraph 15 and its subsections. As to any other Guidelines issues, the parties are free to advocate their respective positions at the sentencing hearing.

16.    The United States and Defendant agree that the United States or Defendant may assert at sentencing and recommend to the Probation Office that Guideline enhancements or adjustments beyond the Guidelines set forth above do or do not apply.

**Rights at Trial**

17.    Defendant understands that by entering into this Agreement, he surrenders certain rights as provided in this Plea Agreement.  Defendant understands that the rights of a defendant include the following:

(a)    If Defendant persisted in a plea of not guilty to the charges, Defendant would have the right to a speedy jury trial with the assistance of counsel.

The trial may be conducted by a judge sitting without a jury if Defendant, the United States, and the Court all agree.

(b)     At a trial, the United States would be required to present witnesses and other evidence against Defendant. Defendant would have the opportunity to confront those witnesses, and his attorney would be allowed to cross-examine them. In turn, Defendant could, but would not be required to, present witnesses and other evidence on his own behalf. If the witnesses for Defendant would not appear voluntarily, he could require their attendance through the subpoena power of the Court.

(c)     At a trial, Defendant could rely on a privilege against self-incrimination and decline to testify, and no inference of guilt could be drawn from such refusal to testify. But if Defendant desired to do so, he could testify on his own behalf.

(d)     As part of this plea agreement, and based upon the concessions of the United States in this plea agreement, Defendant knowingly, willingly, and voluntarily gives up the right to seek any additional discovery. Further, Defendant knowingly, willingly, and voluntarily waives all pending requests for discovery.

### Factual Basis for Guilty Plea

### Introduction

18.     Defendant FLORENCIO "LENCHO" RENDON was a businessman residing in San Antonio, Texas. Since approximately 2006, he has owned and operated two consulting companies, Rendon Company 1 and Rendon Company 2. RENDON previously served as Chief of Staff to a Member of Congress for approximately 24 and a half years.

19.     Co-Conspirator 1 is an elected, federal public official who meets the definition of a "public official" in 18 U.S.C. § 201(a)(1).

20.     Co-Conspirator 2 is the spouse of Co-Conspirator 1. Co-Conspirator 2 owned and controlled CC2 Company 1, a limited liability company formed under the laws of the State of Texas.

21.     Co-Conspirator 3 operated a political consulting company. Co-Conspirator 3

previously served as campaign manager for Co-Conspirator 1.

22.     Co-Conspirator 4 is a Mexican national and public official in Mexico.

23.     Co-Conspirator 5 is a Mexican national and was a high-level executive of Financial Institution 1.

24.     Financial Institution 1 is a bank based in Mexico.  Financial Institution 1 had an interest in U.S. regulation of the financial services industry, particularly U.S. regulation of cross-border financial transactions.  In Co-Conspirator 1's capacity as an elected public official, Co-Conspirator 1 was in a position to influence regulatory matters that affected Financial Institution 1's business.

25.     Co-Conspirator 6 is an adult child of Co-Conspirator 1 and Co-Conspirator 2.  Co-Conspirator 6 owned and controlled CC6 Company 1.

26.     CC6 Company 1 is a limited liability company formed in 2021 under the laws of the State of Texas.

27.     Affiliate 1 was a corporation formed under the laws of the State of Delaware that was affiliated with Financial Institution 1 through common ownership under a Mexican conglomerate.

### The Sham Consulting Contract

28.     On October 13, 2015, RENDON traveled to Mexico City, Mexico, to attend a conference.  Co-Conspirator 1 also attended the conference.  On October 14, 2015, Co-Conspirator 1 invited RENDON to breakfast at a hotel in Mexico City.  Co-Conspirator 1 told RENDON that there was an opportunity to enter a consulting contract with Financial Institution 1 relating to banking.  Co-Conspirator 1 indicated that if RENDON was interested, Co-Conspirator 1 would arrange for RENDON to meet with Co-Conspirator 5 to discuss the potential contract.

RENDON agreed.

29.     RENDON and Co-Conspirator 5 subsequently spoke on the phone and scheduled a breakfast meeting for the following morning.  RENDON informed Co-Conspirator 1 that he was planning to meet with Co-Conspirator 5.

30.     On October 16, 2015, RENDON and Co-Conspirator 5 met for breakfast.  Co-Conspirator 5 explained to RENDON that U.S. regulatory issues were making it difficult for Financial Institution 1 to enter a correspondent banking relationship with a U.S. bank to facilitate remittances, meaning the transfer of money from Mexican workers in the United States to their relatives in Mexico.

31.     Co-Conspirator 5 said that Financial Institution 1 needed assistance finding a U.S. bank that would agree to do business with it.  RENDON indicated that he lacked expertise in banking regulation but referred Co-Conspirator 5 to another individual to assist with regulatory issues.  Later that day, RENDON returned to the United States.

32.     From October 19 to 22, 2015, RENDON visited Mexico City again.  On October 21, 2015, RENDON met Co-Conspirator 5 at a restaurant in Mexico City, where they discussed RENDON entering into a contract with the Financial Institution 1.

33.     On October 30, 2015, RENDON, Co-Conspirator 5 and several Financial Institution 1 executives met at Financial Institution 1's offices in Mexico City.  At the meeting, the Financial Institution 1 executives discussed Financial Institution 1's remittance business and its need for relationships with bigger banks in the United States.

34.     On October 31, 2015, RENDON departed Mexico.  The same day, RENDON emailed himself a series of photographs of a draft contract, which Co-Conspirator 5 had shown RENDON during one of their meetings in Mexico City.  The draft contract pictured in the

photographs was titled "Consulting Agreement" and stated that it was effective June 1, 2015. On the first page of the contract, the name of the "Consultant" was not filled in. However, in the signature block on the final page of the draft contract, the "Consultant" was listed as CC2 Company 1, a company owned by Co-Conspirator 2, the spouse of Co-Conspirator 1. The counterparty to the contract, and the purported recipient of consulting services, was Affiliate 1, a U.S.-based media and television company that was affiliated with Financial Institution 1 through common ownership under a Mexican conglomerate. The draft contract provided that Affiliate 1 would pay the Consultant a "retainer fee" of $12,000 per month for a period of two years in exchange for "strategic consulting and advising services." It also provided for a schedule of "success fees" that would be paid "if [Affiliate 1] is successful in reaching the agreed upon goals within" certain time periods after the effective date of the contract.

35.     On November 15, 2015, RENDON met Co-Conspirator 1 for breakfast in Laredo, Texas. At the meeting, Co-Conspirator 1 and RENDON discussed the Financial Institution 1 contract. Co-Conspirator 1 inquired how much money RENDON would be making under the contract. RENDON told Co-Conspirator 1 that negotiations were ongoing, but that RENDON expected to make approximately $12,000 per month.

36.     At the breakfast meeting between RENDON and Co-Conspirator 1 on November 15, 2015, Co-Conspirator 1 directed Rendon to pay his spouse, Co-Conspirator 2, proceeds from the agreement with Financial Institution 1. Co-Conspirator 1 initially directed RENDON to pay Co-Conspirator 2 under the guise of hiring her in relation to the contract. RENDON declined and explained to Co-Conspirator 1 that RENDON did not believe it was a good idea for him to make the payments to Co-Conspirator 1's spouse directly.

37.     Co-Conspirator 1 then suggested that RENDON pay Co-Conspirator 3 in relation

12

to the contract with Financial Institution 1 and that Co-Conspirator 3 would then, in turn, make payments to Co-Conspirator 1's spouse, Co-Conspirator 2. RENDON agreed to the payment scheme proposed by Co-Conspirator 1.

38.     Co-Conspirator 1 then explained to RENDON that his spouse, Co-Conspirator 2, would be paid $10,000 per month from the $12,000 per month contract price, and RENDON and Co-Conspirator 3 would each get $1,000 per month.  Co-Conspirator 1 also told RENDON that they would need to "take care of" Co-Conspirator 4 for his role in facilitating the agreement with Financial Institution 1.

39.     In response to Co-Conspirator 1's directions, RENDON stated that he wanted more than $1,000 per month.  Co-Conspirator 1 told RENDON to negotiate with Co-Conspirator 5 regarding raising the contract price to $15,000 per month, so that RENDON could keep more than $1,000 per month.

40.     During Co-Conspirator 1's entire discussion with RENDON regarding the creation of the contract with Financial Institution 1, and specifically the payments that would be made to Co-Conspirator 1's spouse, Co-Conspirator 2, there was no discussion about any work that either RENDON, Co-Conspirator 2, or Co-Conspirator 3 would perform in relation to the contract with Financial Institution 1. RENDON understood during his discussions with Co-Conspirator 1 that the contract was a sham consulting contract. RENDON further understood that the agreement with Financial Institution 1, and the payment scheme outlined by Co-Conspirator 1, was a means for Financial Institution 1 to funnel money to Co-Conspirator 1.

41.     Following the November 15, 2015, breakfast meeting, RENDON again met with Co-Conspirator 5 and requested that Co-Conspirator 5 increase the monthly contract fee amount to $15,000.  Co-Conspirator 5 agreed.  On November 26, 2015, Co-Conspirator 5 emailed

RENDON a new version of the contract with the monthly retainer fee changed to $15,000.

42.     On December 17, 2015, RENDON signed the contract. The final version of the contract listed Rendon Company 1 as the "Consultant." It provided that Affiliate 1 would pay Rendon Company 1 $15,000 per month for a period of two years, effective January 1, 2016, in exchange for "strategic consulting and advising services." It also contained the schedule of "success fee[s]," with the amounts slightly lowered from the October 31, 2015 draft.

43.     On January 11, 2016, representatives of Affiliate 1 countersigned the contract.

44.     On February 1, 2018, RENDON and representatives of Affiliate 1 signed an agreement extending the contract by one year, such that it would extend through December 31, 2018.

## Payments Flowing from Affiliate 1, through RENDON, to Co-Conspirator 3

45.     Beginning in February 2016, Rendon Company 1 sent invoices to Affiliate 1 in the amount of $15,000 per month. The invoices purported to be for strategic consulting services. For example, the invoice dated February 12, 2016, sent from Rendon Company 1 to Affiliate 1, contained the following "Description" of the invoiced amount: "January 2016 Consulting Fees for strategic consulting and advising services as per contract effective January 1, 2016."

46.     From February 22, 2016, through January 9, 2019, Rendon Company 1 received payments of $15,000 on an approximately monthly basis from Affiliate 1, totaling $540,000, as follows:

| Payments from Affiliate 1 to Rendon Company 1 |
| Date | Method | Amount | Check or Wire Memo Line |
|---|---|---|---|
| 2/22/2016 | Wire | $30,000 | "[RENDON COMPANY 1] INVOICES 1164, 1165" |
| 3/15/2016 | Wire | $15,000 | "[RENDON COMPANY 1] MARCH INVOICE-1166" |
| 4/7/2016 | Check | $15,000 | "INV#1168" |
| 4/26/2016 | Wire | $15,000 | "[RENDON COMPANY 1] INVOICES 1168" |
| 6/17/2016 | Wire | $15,000 | "[RENDON COMPANY 1] INVOICES 1170" |
| 7/15/2016 | Wire | $15,000 | "[RENDON COMPANY 1] INVOICE 1172" |
| 9/6/2016 | Wire | $15,000 | "[RENDON COMPANY 1] INVOICE 1173" |
| 9/22/2016 | Wire | $15,000 | "[RENDON COMPANY 1] SEPT INVOICE 1174" |
| 11/1/2016 | Wire | $30,000 | "[RENDON COMPANY 1] INVOICE 1175, 1176" |
| 12/8/2016 | Wire | $15,000 | "[RENDON COMPANY 1] DEC INVOICE 1181" |
| 2/1/2017 | Wire | $15,000 | "[RENDON COMPANY 1] JAN INVOICE 1184" |
| 2/22/2017 | Wire | $15,000 | "[RENDON COMPANY 1] FEB INVOICE 1185" |
| 3/21/2017 | Wire | $15,000 | "[RENDON COMPANY 1] INVOICE 1186" |
| 4/13/2017 | Wire | $15,000 | "[RENDON COMPANY 1] APRIL INVOICE 1190" |
| 5/24/2017 | Wire | $15,000 | "[RENDON COMPANY 1] INVOICE 1191" |
| 6/7/2017 | Wire | $15,000 | "[RENDON COMPANY 1] JUNE INVOICE 1192" |
| 7/27/2017 | Wire | $15,000 | "[RENDON COMPANY 1] INVOICE 1195" & "JULY CONSULTING FEES" |
| 9/12/2017 | Wire | $30,000 | "AUG, SEPT INVOICES INV 1196-1197" |
| 10/19/2017 | Wire | $15,000 | "[RENDON COMPANY 1] INVOICE 1204" |
| 11/7/2017 | Wire | $15,000 | "[RENDON COMPANY 1] INVOICE 1205" |
| 12/15/2017 | Wire | $15,000 | "[RENDON COMPANY 1] DEC INVOICE 1206" |
| 2/21/2018 | Wire | $30,000 | "[RENDON COMPANY 1] INVOICES 1207,1208" |
| 3/16/2018 | Wire | $15,000 | "[RENDON COMPANY 1] INVOICE 1209" |
| 3/22/2018 | Wire | $15,000 | "[RENDON COMPANY 1] INVOICE 1209" |
| 5/22/2018 | Wire | $15,000 | "INVOICE 1211" |
| 6/4/2018 | Wire | $15,000 | "INVOICE 1212" |
| 7/13/2018 | Wire | $15,000 | "JULY INVOICE 1213" |
| 8/10/2018 | Wire | $15,000 | "[RENDON COMPANY 1] INVOICE 1214" |
| 9/10/2018 | Wire | $15,000 | "[RENDON COMPANY 1] INVOICE 1215" |
| 10/16/2018 | Wire | $15,000 | "[RENDON COMPANY 1] INVOICE 1216" |
| 11/23/2018 | Wire | $15,000 | "[RENDON COMPANY 1] INVOICE 1217" |
| 1/9/2019 | Wire | $15,000 | "[RENDON COMPANY 1] INVOICE 1218" |
| TOTAL | | $540,000 | |

47.    Neither RENDON nor Rendon Company 1 provided any services to Affiliate 1 or Financial Institution 1 in exchange for these payments.

48.    Rather, from March 24, 2016, through December 27, 2017, pursuant to his agreement with Co-Conspirator 1, RENDON used the funds that Rendon Company 1 received from Affiliate 1 to make payments of $11,000 to Co-Conspirator 3 on an approximately monthly basis, totaling $242,000.  Rendon Company 1 retained the remaining $4,000 per month of the funds that it received from Affiliate 1.

49.    RENDON understood that, of the $11,000 per month that his businesses paid to Co-Conspirator 3, Co-Conspirator 3 paid approximately $10,000 per month to Co-Conspirator 1 through payments made to CC2 Company 1, the company owned and controlled by Co-Conspirator 1's spouse, Co-Conspirator 2.  To RENDON's knowledge, Co-Conspirator 2 did not provide any services in exchange for the payments routed from RENDON through Co-Conspirator 3.

50.    On multiple occasions, Co-Conspirator 1 messaged RENDON with words to the effect of, "[Co-Conspirator 2's Initials] asking."  RENDON understood these messages to mean that Co-Conspirator 1 was inquiring about the status of the payments being made to his spouse, Co-Conspirator 2.

51.    In late 2017 or early 2018, Co-Conspirator 1 told RENDON to stop making monthly payments to Co-Conspirator 3.  Accordingly, although RENDON continued to receive monthly payments from Affiliate 1, RENDON paused the monthly payments that he had been making to Co-Conspirator 3. RENDON understood that he remained obligated to eventually pay Co-Conspirator 1 $10,000 of every monthly payment he continued to receive from Affiliate 1.

52.    In March 2018, Co-Conspirator 1 asked RENDON to try making additional

payments to Co-Conspirator 3, in an effort to get the funds to Co-Conspirator 2. RENDON made three additional payments to Co-Conspirator 3 in the amounts of $7,000, $5,000, and $7,000. After the final payment of $7,000, Co-Conspirator 1 instructed RENDON to "cut it off," which RENDON understood to mean to stop making payments to Co-Conspirator 3.

53.     In total, Rendon Company 1 and Rendon Company 2 paid $261,000 to Co-Conspirator 3, as detailed below:

| Payments from Rendon Company 1 and Rendon Company 2 to Co-Conspirator 3 | | | |
|---|---|---|---|
| Date | Method | Amount | Check or Wire Memo Line |
| 3/24/2016 | Check | $22,000 | "[Lubricant Company 1] Consulting" |
| 4/8/2016 | Check | $11,000 | "Monthly Consulting Fee" |
| 6/3/2016 | Check | $11,000 | "March Services" |
| 6/3/2016 | Check | $11,000 | "April Services" |
| 7/14/2016 | Check | $11,000 | "June [Lubricant Company 1]" |
| 8/8/2016 | Check | $11,000 | "July Payment [Lubricant Company 1] Project" |
| 9/14/2016 | Check | $11,000 | "August" |
| 10/20/2016 | Check | $11,000 | "Consulting [Lubricant Company 1] Sept" |
| 12/8/2016 | Check | $11,000 | "Nov" |
| 12/20/2016 | Check | $11,000 | "Dec Invoice Consulting" |
| 2/13/2017 | Check | $11,000 | "Jan Payment per Contract" |
| 3/20/2017 | Check | $11,000 | "Feb Payment" |
| 4/17/2017 | Check | $11,000 | "March" |
| 5/29/2017 | Check | $11,000 | "Apr. Payment" |
| 6/28/2017 | Check | $11,000 | "May" |
| 8/7/2017 | Check | $11,000 | "June" |
| 9/7/2017 | Check | $11,000 | "July 2017" |
| 9/22/2017 | Check | $11,000 | "Aug" |
| 10/16/2017 | Check | $11,000 | "Sept" |
| 12/15/2017 | Check | $11,000 | "Nov" |
| 12/27/2017 | Check | $11,000 | "Dec" |

| | | | |
|---|---|---|---|
| 3/20/2018 | Check | $7,000 | "Jan (Petro project" |
| 3/26/2018 | Check | $5,000 | "Jan Final – Lubricant Project" |
| 6/11/2019 | Check | $7,000 | "Consult" |
| **TOTAL** | | **$261,000** | |

### Payments to Co-Conspirator 4

54.   From the outset of the Financial Institution 1 contract, Co-Conspirator 1 told RENDON that Co-Conspirator 4 needed to be paid because he "brought the deal to the table." Approximately nine months after RENDON began receiving money from Affiliate 1, Co-Conspirator 4 began to call and text RENDON regarding the money Co-Conspirator 4 believed he was owed.   At one point, Co-Conspirator 4 asked RENDON to make payments to Co-Conspirator 4 through Co-Conspirator 4's spouse's bank account, but RENDON never did.

55.   RENDON eventually made approximately two payments totaling approximately $7,000 to $9,000 to Co-Conspirator 4 using cash that he kept at a law firm in Mexico.   Co-Conspirator 4 continued to ask RENDON to make payments related to the Financial Institution 1 contract.

### Payments to Co-Conspirator 6

56.   In late 2021, Co-Conspirator 1 asked RENDON to hire his adult child, Co-Conspirator 6.   RENDON and Co-Conspirator 6 began discussing a purported consulting agreement between Co-Conspirator 6 and Rendon Company 1.   RENDON and Co-Conspirator 6 reached a verbal agreement that RENDON would pay Co-Conspirator 6 $2,000 per month for purported consulting services.   RENDON understood that the purpose of the contract with Co-Conspirator 6 was to pay the remainder of the money that RENDON owed to Co-Conspirator 1 under the Financial Institution 1 contract.

57.   On November 2, 2021, RENDON met Co-Conspirator 6 at a restaurant in Laredo,

Texas, to discuss the purported consulting agreement. At the meeting, RENDON gave Co-Conspirator 6 a check in the amount of $2,000, with the memo line, "Consulting," payable to Co-Conspirator 6's company, CC6 Company 1. RENDON and Co-Conspirator 6 had not entered into any written contract as of that date.

58.     In January 2022, RENDON was served with a federal grand jury subpoena seeking documents and information relating to the above-described conduct. Because of that subpoena, RENDON did not make any further payments to Co-Conspirator 6.

59.     After the payment of $2,000 to Co-Conspirator 6 on November 2, 2021, RENDON understood that he still owed then, and still owes today, money to Co-Conspirator 1 related to the Financial Institution 1 contract.

60.     During the entire time RENDON received payments from Affiliate 1, Co-Conspirator 1 and RENDON did not explicitly discuss any official acts that Co-Conspirator 1 performed on behalf of Co-Conspirator 5 or Financial Institution 1. However, based on the entirety of the circumstances presented to RENDON, RENDON understood that the payments were the proceeds of criminal activity. Specifically, RENDON understood that: (a) Co-Conspirator 1 organized and directed the payment scheme by which RENDON funneled money to Co-Conspirator 1's spouse; (b) neither Co-Conspirator 2, Co-Conspirator 3, nor RENDON performed any work in exchange for the payments made by Affiliate 1 on behalf of Financial Institution 1; (c) U.S. regulatory issues were making it difficult for Financial Institution 1 to find a correspondent U.S. bank to work with on remittances; and (d) Co-Conspirator 1 was a public official with the ability to affect U.S. regulatory issues through official action. In light of these circumstances, among others, RENDON understood that the payments funneled to Co-Conspirator 1 were proceeds of some form of unlawful activity and that the payments were made in exchange for

official acts requested of Co-Conspirator 1, or offered by Co-Conspirator 1, to the benefit of Financial Institution 1.

## Breach of Plea Agreement

61.     If Defendant should fail in any way to fulfill completely all of the obligations under this Plea Agreement, the United States will be released from its obligations under the Plea Agreement, and Defendant's plea and sentence will stand.   If at any time Defendant retains, conceals, or disposes of assets in violation of this Plea Agreement, including required financial information, or if Defendant knowingly withholds evidence or is otherwise not completely truthful with the United States, then the United States may move the Court to set aside the guilty plea and reinstate prosecution.  Any information and documents that have been disclosed by Defendant, whether prior to or subsequent to this Plea Agreement, and all leads derived therefrom, will be used against Defendant in any prosecution.

## Monetary Penalties, Assets and Financial Disclosures

62.     Defendant understands and agrees that monetary penalties will be subject to immediate enforcement as provided in 18 U.S.C. § 3613 and that monetary penalties will be submitted to the Treasury Offset Program so that payments to Defendant may be applied to federal debts.

63.     Defendant understands that restitution, forfeiture, and fines are separate components of sentencing and are separate obligations. Defendant agrees to take all steps necessary to pass clear title to forfeitable assets to the United States and to assist fully in the collection of restitution and fines. Subject to the provisions of paragraph 7 above, Defendant waives the right to challenge in any manner, including by direct appeal or in a collateral proceeding, any restitution order, any forfeiture orders, and any fines.

**Restitution**

64.     Defendant agrees to pay full restitution to the victims regardless of the count of conviction.  Defendant agrees to pay full restitution as determined by the Court, regardless of the resulting loss amount, to all victims harmed by Defendant's "relevant conduct," as defined by U.S.S.G. §1B1.3, including conduct pertaining to any dismissed counts or uncharged conduct, and regardless of whether such conduct constitutes an "offense" under 18 U.S.C. §§ 2259, 3663 or 3663A. Defendant agrees that restitution imposed by the Court will be due and payable immediately and that should the Court impose a payment schedule, the payment schedule sets forth minimum payments and does not foreclose additional collection of restitution.

**Forfeiture**

65.     As part of this plea agreement, Defendant agrees to the following:

(a) to forfeit, via either an administrative or judicial proceeding, a money judgment in an amount to be determined at sentencing.

(b) to withdraw any claims and petitions for such listed or seized assets, whether in this proceeding or another proceeding, and to waive notice of administrative proceedings (including forfeiture, destruction, and abandonment for seized property);

(c) that Defendant agrees to the imposition of a money judgment in the amount determined at sentencing;

(d) that one or more of the conditions set forth in 21 U.S.C. § 853(p) exists, so that the forfeiture money judgment may be immediately satisfied via forfeiture of substitute property; and

(e) to the order of forfeiture becoming final as to Defendant immediately following this guilty plea or immediately following entry of the forfeiture order, whichever applies.

(f) the government will defer to the Court with respect to any payment schedule regarding any forfeiture amount owed by Defendant and moreover, will not object should the Court determine Defendant may pay any forfeiture amount in installments approved by the Court.

**Financial Statement**

66.     Defendant agrees to truthfully complete under penalty of perjury, within thirty days of the filing of this Plea Agreement with the Court, a financial statement on a form provided by the United States and to update the statement within seven days of any material change. Defendant also agrees to make full disclosure to the United States Probation Office of all current and anticipated assets in which Defendant has an interest both before sentencing and again before termination of supervised release or probation, with such disclosures to be shared with the United States.

67.     Defendant further agrees not to dispose or transfer any assets without the prior written permission of the United States and to authorize the release of all financial information requested by the United States, including, but not limited to, credit histories and tax returns. Defendant agrees to discuss and answer any questions by the United States relating to Defendant's financial disclosure, including in a deposition or informal debtor exam, whether before or after sentencing.

**Complete Agreement**

68.     This written Plea Agreement, consisting of 25 pages, including the Plea Agreement Addendum, constitutes the complete agreement between the United States, Defendant, and his counsel.  No promises or representations have been made by the United States except as set forth in writing in this Plea Agreement.  Defendant acknowledges that no threats have been made against him and that he is pleading guilty freely and voluntarily because he is guilty.

69.     Any modification of this Plea Agreement must be in writing and signed by all parties.

Filed at _Houston_____, Texas, on __March 4_____, 2024.

_____
Defendant

Subscribed and sworn to before me on __March 4_____, 2024.

NATHAN OCHSNER, Clerk
UNITED STATES DISTRICT CLERK

By: _____
Deputy United States District Clerk

APPROVED:

COREY R. AMUNDSON
Chief, Public Integrity Section
Criminal Division
U.S. Department of Justice

By: _____
Marco A. Palmieri
Rosaleen O'Gara
Celia Choy
Attorneys for the United States

JENNIFER KENNEDY GELLIE
Executive Deputy Chief
   performing the duties of Chief
Counterintelligence and Export Control Section
National Security Division
U.S. Department of Justice

By: _____
Garrett Coyle
Attorney for the United States

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| v. | § | Case No. |
| | § | |
| FLORENCIO "LENCHO" RENDON, | § | |
| | § | |
| Defendant. | § | |

## PLEA AGREEMENT ADDENDUM

I have fully explained to Defendant his rights with respect to the Information.  I have reviewed the provisions of the United States Sentencing Commission's Guidelines Manual and Policy Statements, and I have fully and carefully explained to Defendant the provisions of those Guidelines that may apply in this case.  I have also explained to Defendant that the Sentencing Guidelines are only advisory, and the Court may sentence Defendant up to the maximum allowed by statute per count of conviction.  Further, I have carefully reviewed every part of this Plea Agreement with Defendant.  To my knowledge, Defendant's decision to enter into this Plea Agreement is an informed and voluntary one.

Craig Tobin
Attorney for Defendant

3-14-24
Date

24

I have consulted with my attorney and fully understand all my rights with respect to the ~~Superseding Indictment~~ Information against me. My attorney has fully explained and I understand all my rights with respect to the provisions of the United States Sentencing Commission's Guidelines Manual that may apply in my case. I have read and carefully reviewed every part of this Plea Agreement with my attorney. I understand this Plea Agreement, and I voluntarily agree to its terms.

_____
Florencio "Lencho" Rendon
Defendant

3/4/24
Date